[Civ. No. 7286. Third Dist., Jan. 17, 1947.]

MARY M. BURNS, Respondent, v. JOHN RADOICICH et al., Appellants.

Gladstein, Andersen, Resner, Sawyer & Edises, Harold M. Sawyer and Busick & Busick for Appellants.

Galen McKnight and Frank C. Lerrigo for Respondent.

LEMMON, J. pro tem.—By the judgment in this case, plaintiff recovered a money reward against John Radoicich and an adjudication setting aside as fraudulent two conveyances of real property, one made by John Radoicich and wife to Mike Radoicich and the other by the same grantors to Vernon Radoicich. Mike Radoicich individually and as guardian of Vernon Radoicich appeals from the judgment and attacks that part of the judgment which voids the two conveyances.

John and Vernon are father and son and John and Mike are brothers. John, his wife, Zora, and Mike located in Madera County in the year 1924, on a forty-acre farm which they leased and work together. Vernon was born in the year 1925 and was a minor until after the judgment was entered. Since the birth of Vernon, the four have lived continuously in the same house, except for several months in 1925 during which Mike was absent. In 1927 the two brothers bought forty acres of land and took title thereto as tenants in common. The following year improvements, including a house, were erected thereon, the cost of which was advanced by Mike. To protect Mike for his outlay and in October, 1928, John conveyed to him his undivided one-half interest in the twenty acres upon which the improvements had been erected. Thereupon, Mike became the sole owner of that twenty acres and the two brothers remained the owners as tenants in common of the remaining twenty acres originally purchased by them. This latter property is one of the parcels, the title to which is involved in this appeal, and will for convenience be referred to

as *parcel No. One*. In 1929, John bought another twenty acres, immediately to the south of and adjoining the forty acres originally purchased. This purchase was upon contract, the vendor being Charles F. Crothers. In 1937, Crothers transferred his interest in the contract and land to Nellie B. Hunkins, the Crothers contract was thereafter cancelled, and a new contract was entered into between Nellie B. Hunkins and John for the sale of the land from her to him. The real property, the subject of this contract, is the other parcel the title to which is here involved. It will be referred to as *parcel No. Two*.

It is conceded that at the times when the two questioned deeds were executed and delivered John was insolvent and that if the transfers were not made for a fair consideration they were subject to attack. (Civ. Code, § 3439.04.) It is appellants' contention that as to each transfer there was a fair consideration.

On August 19, 1940, there was paid to Mrs. Hunkins through a title company by a check signed by Mike upon his bank account the sum of $1,850. Thereupon, a deed was executed by her to John, covering parcel No. Two. On the same day, a deed was executed by John and Zora to Vernon conveying this property. Three days later, John and Zora deeded to Mike parcel No. One. Mike, John and Zora each testified that Mike paid to John the sum of $1,000 in cash for this deed. The original indebtedness upon the north forty acres of which parcel No. One is a part was $5,100. This indebtedness had been reduced on August 22, 1940, to $4,800 and was evidenced by a promissory note executed by John, Zora and Mike. There is evidence in the case that parcel No. One was worth on that date $5,500 and appellants argue there is a fair consideration for that transfer. As to parcel No. Two it is appellants' contention that John, upon receiving title, became a trustee for Mike, and the conveyance from him to Vernon did not diminish John's assets.

That there was a close association between Mike and John during all of the period of time mentioned admits of no doubt. That association was one of extreme faith and confidence. John, his wife and son lived with Mike in the house built upon the twenty acres, the title to which became vested in Mike. And upon this same property John erected in 1938 a packing shed and engaged in the business of packing and processing of raisins thereon. The two parcels here in question were irri-

gated from Mike's property. Each of the brothers worked upon these two places, though John's efforts were mostly devoted to the packing business after the erection of the packing shed. Mike at times helped his brother in that business. There is slight evidence that some of these activities were conducted under the name of Radoicich Bros. John's plight in August when the deeds were made must have been known to this circle of intimates; indeed, the record affirmatively shows that it was known by all of them.

Appellants contend that the findings of fraudulent character of the transfers is contrary to the uncontradicted evidence in the record and they are therefore wholly unsupported.

Although a trial court may not arbitrarily disregard the unimpeached testimony of a witness, this rule, as has been stated, has many qualifications and exceptions. The rule, frequently followed in this state, is expressed in *Quock Ting* v. *United States,* 140 U.S. 417 [11 S.Ct. 733, 851, 35 L.Ed. 501]:

"There may be such an inherent improbability in the statements of a witness as to induce the court or jury to disregard his evidence, even in the absence of any direct conflicting testimony. He may be contradicted by the facts he states as completely as by direct adverse testimony, and there may be so many omissions in his account of particular transactions, or of his own conduct, as to discredit his whole story. His manner, too, of testifying, may give rise to doubts of his sincerity, and create the impression that he is giving a wrong coloring to material facts. All these things may properly be considered in determining the weight which should be given to his statements, although there be no adverse verbal testimony adduced." (See, also, *Davis* v. *Judson,* 159 Cal. 121, 128 [113 P. 147]; *Blanc* v. *Connor,* 167 Cal. 719, 722-723 [141 P. 217].) It is thus seen that a trial court is not bound to accept and blindly believe the testimony of a witness merely because it is not contradicted, but, to the contrary, the verity of such testimony is to be tested in the light of all of the facts and circumstances. (*Simon Newman Co.* v. *Woods,* 85 Cal.App. 360, 365 [259 P. 460]; *MacDiarmid* v. *McDevitt,* 97 Cal.App. 414, 418 [275 P. 500].) The interest of the witness in the outcome of the litigation is of importance in weighing his testimony. (*County of Sonoma* v. *Stofen,* 125 Cal. 32, 38-39 [57 P. 681].) Relationship between grantor and grantee does not justify an inference of fraud in the conveyance, but

it is a fact which gives greater weight to other circumstances, if any such appear, than might otherwise attach to them. (*Bank of Henderson* v. *Dozier*, 24 Tenn.App. 178 [142 S.W.2d 191].) ▮▮ The manner in which a witness testifies often operates as an impeachment of the verity of his story. (*Phillips* v. *Hobbs-Parsons Co.*, 67 Cal.App. 199 [227 P. 622].) Inherent improbability justifies the rejection of a witness's testimony in its entirety. (*Blankman* v. *Vallejo*, 15 Cal. 638, 639.) Testimony which is evasive, equivocal, confused, or otherwise uncertain, may be disregarded. (20 Am.Jur. 1031.) Thus, a reviewing court may not disturb the rejection by the trial court of testimony which is uncontradicted if it is discredited under these tests.

▮▮ In the light of these rules, we may not say that the trial court was bound to accept the version of these transactions related by the parties thereto and who are the defendants in this action. John did not know that a deed had been made to him of parcel No. Two; neither did he know that he and his wife had executed a deed to Vernon. He said that he did not discuss the deed to Vernon with his wife or with the party at the title company office where the deeds were prepared prior to the execution thereof. Stranger still, he said he did not know that Vernon had a deed to the property until Vernon so informed him sometime after the recordation of the deeds. He denied that he had signed a financial statement at a bank listing the entire sixty acres as the property of Radoicich Brothers, and when confronted with the statement, he was evasive as to whether the signature appearing thereon was his. He denied having listed early in 1940 the sixty acres as belonging to him in an application for a bond. There is proof that he did sign such an application. He had a poor or no recollection about important matters, particularly where admissions might be damaging to the defendants. In a few instances, he repudiated answers which he had previously made with positiveness. When Mike was under cross-examination questions were directed to him as to the source of the $1,000 which he stated he had paid to John. He was evasive, as he had been as to the number of bank accounts in his name, and finally stated that the money had been buried on his ranch. When pressed as to where on the ranch the money had been buried he refused to divulge this information and concluded by saying, "That is my secret." This inquiry was quite important. It related to something material in the case. When

a witness evades or refuses to answer a question which is directed to elicit material testimony, the court is warranted in distrusting any or all of such witness's testimony. Zora contributed little as a witness. She was present when the $1,000 was paid by Mike to John but did not know where Mike had procured the money. Vernon's deposition (he being away in the armed service at the time of the trial) was introduced. He stated that parcel No. Two from his early childhood had always been referred to in the family circle as belonging to him; that he worked exclusively thereon and that $250 to $275 given to him as presents was used in making payments upon the contract under which his father was purchasing the property. He claimed that in August, 1940, his father stated to him that he could make no further payments on that contract; that he appealed to his uncle and that Mike agreed to pay for him the balance due to Mrs. Hunkins. However, the contract and the equitable interest in the land was in John and if the balance of contract price was paid with John's money the conveyance to Vernon while John was insolvent would under the law be fraudulent as to John's creditors.

Evidence of fraud in this case is circumstantial. Indeed, direct proof of fraudulent conveyance is often impossible. Proof indicative of fraud may come by inference from circumstances surrounding the transaction, relationship and interest of the parties. (*Fitz-Patrick* v. *Osborne,* 57 Cal.App.2d 226 [134 P.2d 297].) Indicia of fraud when considered separately may be insufficient to establish fraud but, when considered together, by their number and association may suffice as strong evidence of fraudulent intent. What has been here related as bearing upon the impeachment of John and Mike furnishes such circumstances. In addition, Mike worked and cared for parcel No. Two after August, 1940, sold the grapes harvested thereon and received the proceeds therefrom. On October, 1940, he was appointed guardian for Vernon. Since his appointment as such he has never filed an accounting in the guardianship proceeding and not until March 24, 1943, did he open a bank account for Vernon in which to deposit the proceeds from that parcel or other funds belonging to the ward. In each of the years 1941, 1943 and 1944 he personally executed crop mortgages to secure indebtedness owing to banks and in each instance included crops growing or to be grown on parcel No. One.

It is quite significant that on April 1, 1940, Mike executed

to John a crop mortgage covering crops to be grown on parcels Nos. One and Two. The indebtedness secured thereby did not mature until 1945. Nevertheless, four months later and shortly before the deeds here under attack were executed, when John was in financial difficulties and having much harassment in fulfilling a contract with the Federal Surplus Commodities Corporation under which he was obligated to deliver processed raisins, he paid to Mike upon this indebtedness, as he put it, "something like $4,000." The inference under all of the circumstances may not be said to be unwarranted that this was the source of the payment to Mrs. Hunkins and the $1,000 which Zora stated she saw paid by Mike to John. It may be reasonably inferred that at the time the $4,000 was paid there was an understanding between the brothers that so much thereof as was necessary would be used by Mike to pay Mrs. Hunkins, the title to be placed in Vernon's name in order to save the property for John, and that $1,000 of the $4,000 would be paid back by Mike to John to lend color of consideration. If that be so, that portion of the $4,000 represented by the $1,000 and the $1,850 paid to Mrs. Hunkins was not paid upon the crop mortgage but represents money received by Mike to be paid out for John's use under that understanding.

The judgment is affirmed.

Adams, P. J., and Thompson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 17, 1947.