[Civ. No. 20397.   Second Dist., Div. Three.   Mar. 16, 1955.]

A. S. MENICK, as Trustee, etc., Respondent, v. EDITH ALLEN GOLDY, Appellant.

Mason & Howard and C. Loy Mason for Appellant.

Russell B. Seymour for Respondent.

VALLÉE, J.—Appeal by defendant from part of a judgment in favor of plaintiff in an action brought by plaintiff as trustee in bankruptcy of Samuel Goldy to recover from defendant, the minor daughter of the bankrupt, an automobile allegedly purchased with funds of the bankrupt while he was insolvent.

In August 1950 the bankrupt, referred to as Goldy, received approximately $30,000 as part payment from the sale of real property. He converted the proceeds into a $25,000 cashier's check and $5,000 in cash and spent some of it for various bills. On September 9, 1950, he and his wife left for Europe with the $25,000 cashier's check and "a few thousand dollars."

Sometime around November 1950, when Goldy was in Rome, Italy, he exchanged the $25,000 cashier's check for three letters of credit, two for $10,000 each and one for $4,000, and $1,000 cash. Goldy and his wife were in Europe about 10 months. In the meantime, on January 12, 1951, a judgment was obtained by the Cowplands against Goldy for approximately $13,000.

Goldy and his wife returned to the United States with the intention to disembark and complete their trip in San Francisco. Instead, they left the ship in San Diego. Goldy testified that when he arrived in San Diego he had on his person the two letters of credit for $10,000 each, the letter of credit for $4,000 against which $2,000 had been drawn, and approximately $150 or $200 in cash. He immediately telephoned defendant in Los Angeles and informed her of their arrival. Defendant then went to San Diego. Before defendant met them in San Diego, a friend took Goldy and his wife to a Cadillac agency. Goldy told the salesman that "his daughter was coming down the following day and was interested in getting a car for herself and he looked over the cars . . . to see if there was anything she might be interested in."

Defendant was 17 years of age on June 6, 1951. She testified that before she left for San Diego she met her grandmother in downtown Los Angeles in a small café and that her grandmother gave her an envelope with $2,568 in cash in it; she counted the money. She then went to San Diego by bus

and met her parents aboard ship. After she arrived she told them she wanted to look at cars, but she did not tell them the "specific type of car." The following morning, June 7, defendant and her parents went to the Cadillac agency and her father introduced her to the salesman. Both defendant and her father negotiated with the salesman over the purchase of a 1948 Cadillac, Fleetwood style; they would step to one side and discuss the car. Defendant made the actual offer of $2,400, her father advising her. Defendant gave the salesman $200 as a deposit, stating she did not have the balance of the money with her at the time. The salesman made the sales order out in the name of Edith Allen Goldy and defendant signed "Edith Allen Goldy" on the slip, but she told him she wished to have the car registered in the name of Edith Allen and the name "Goldy" was crossed out on the sales order. Defendant took delivery of the Cadillac in the morning of June 8th at which time she paid the balance of $2,221 in currency, mostly $100 bills, taking the money from her purse. Goldy then told the salesman he wanted to get some cash. The latter drove Goldy to a bank and Goldy drew against one of the letters of credit. Goldy testified that between the time he arrived in San Diego and the time defendant paid for the automobile he had not received any additional sums of cash from any source, and that he did not give any part of the $150 or $200 to defendant to help pay for the car.

In June 1951 defendant had only a temporary driver's permit which had expired. During the discussions with the automobile salesman, Goldy asked him to drive the automobile and accompany defendant to San Pedro where the ship that he and his wife were traveling on would dock. However, instead, Goldy and his wife drove with defendant to Los Angeles, defendant driving the car away from the Cadillac agency.

On June 12 Goldy saw Cowpland in the waiting room of Warner Brothers Studio in Burbank. Goldy told Cowpland, "I just drove some friends out here *in my new car* . . ." (Italics added.) It may be inferred that the car was the Cadillac. He did not say where or when he had purchased the automobile.

On June 13 Goldy and his wife drove to San Francisco in the Cadillac, having missed the ship. Goldy testified they went to San Francisco to meet Joseph Bernstein pursuant to an alleged arrangement they made while they were in Paris

in January 1951. On June 14 Goldy met Bernstein. The next day the Cadillac was attached. Goldy testified this was the first time he knew of Cowplands' judgment against him. Goldy informed Bernstein that the automobile had been attached and that he wanted to pay him what he owed from a $25,000 loan Bernstein made to him in 1946. Goldy testified he had received the $25,000 in cash and had not deposited it in any bank but had disbursed the money in cash to various people and that any records thereof had been lost. Although Goldy has issued numerous financial statements after 1946, he never listed Bernstein as a creditor. Saturday morning, June 16th, Goldy went to a bank, cashed the letters of credit, and received mostly $1,000 bills. He testified he gave $21,500 and a two-and-a-half carat diamond ring to Bernstein and retained only $150; and that Bernstein gave him his note back and he tore it up.

On August 17, 1951, Goldy was adjudicated bankrupt.

Defendant testified that she bought the 1948 Cadillac with her own money and not with her father's. She said the $2,568 she received from her grandmother was what she had saved since she was 6 years old from various part-time jobs and gifts from her grandmother, some of which were as large as $100. She had given the moneys to her grandmother to keep for her. When she was 13 or 14 years old, she asked her grandmother how much money she had saved for her and her grandmother said she had about $1,000. Since then, she had not asked how much money her grandmother was holding for her. She further testified that she had not kept a record of how much money she had given her grandmother.

The grandmother, Carrie Clause, testified variously as to where she had kept defendant's money: with Citizens National Bank; in 1948 she withdrew $2,000 from Security-First National Bank; on several occasions she had put the money in a bank and had withdrawn it and kept it at home; and that she never put any of the money into a bank, but kept it with her. She further testified she did not keep any account of the money that defendant gave her and did not keep it separate from her own money.

The grandmother has never earned enough money to file an income tax return; since 1940, her earnings were less than $500 a year. In November 1951 she had a severe operation. She testified that within the two years preceding April 17, 1952, she had not borrowed any money. Twenty-one bank books belonging to the grandmother were introduced

in evidence covering the period from 1923 to June 6, 1951. The following balances were revealed:

| | |
|---|---:|
| July 1, 1950 | $ 407.77 |
| Jan. 1, 1951 | 2,924.10 |
| June 6, 1951 | 3,278.00 |

She testified that prior to August 1950 Goldy repaid her the sum of $5,000 which he had borrowed in September 1948; she received $3,000 from an escrow in August 1950; on July 18, 1951 she had approximately $800 in cash at home and $4,098.99 in two Federal Savings accounts. On October 23 and 24, 1951, she opened three new accounts at three banks with total deposits of $6,559 and deposited $1,000 in one of the Federal Savings accounts. The deposits were primarily in multiples of $1,000.[1] The sum of the deposits was $7,559, which when added to the assets as of July 18, 1951 totaled $11,676.28 as of February 7, 1952. When questioned as to where she had the $7,559 on October 22, 1951, she said she had it at home in a trunk and that it was there on the date defendant bought the car. She also stated she had always kept large sums of money at home.

About January 19, 1952, the grandmother purchased an automobile for $1,825 for Goldy. On February 1 and 7, 1952, she withdrew $4,320.28 from the two Federal Savings accounts and $6,359 from two of her bank accounts—a total of $10,679.28. Goldy and the grandmother testified that after February 7, 1952, she loaned Goldy $14,000, mostly in the form of $1,000 bills. Thus she gave Goldy $15,825 as against a total of $4,898.99 she had on July 18, 1952, and as against a total of not over $11,676.28 she had on February 7, 1952.

The court found: (1) On June 8, 1951 Goldy was insolvent. (2) On June 8, 1951 Goldy transferred the sum of $2,400 from his own funds to defendant; there was no consideration for the transfer; the transfer was made by Goldy for the purpose of hindering, delaying, and defrauding his creditors, and with the intent that defendant would purchase

---

[1] On October 23, 1951, the grandmother opened Account No. 109976 in the Bank of America, Main Office, Los Angeles, and deposited therein two items of $1,000 each, and on October 24, 1951, an additional sum of $300.

On October 24, 1951, she deposited $1,000 in the Los Angeles Federal Savings Account, No. 18677.

On October 24, 1951, she opened a new account at Bank of America, Florence-Vermont Branch, of $4,000 and $59, being Account No. 8379.

On October 24, 1951, she opened a new account at Security-First National Bank of Los Angeles, No. 622136, with a deposit of $200.

with the $2,400 the 1948 Cadillac, and with the further intent and purpose that defendant would take title to the car in her own name and hold the title secretly for and on behalf of Goldy. Judgment was, in part, that plaintiff is the owner of the automobile and that defendant deliver it to plaintiff. Other parts of the judgment are not in controversy. Defendant appeals.

The specification of error is that there is no evidence to support the finding that Goldy transferred the $2,400 to defendant.

"Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." (Civ. Code, § 3439.04.) A conveyance includes "every payment of money." (Civ. Code, § 3439.01:) ■ A voluntary conveyance made by a debtor to a member of his family while insolvent or in contemplation of insolvency, is conclusively presumed to be fraudulent as to existing creditors. (*Adams* v. *Prather,* 176 Cal. 33 [167 P. 534]; *Carter* v. *Carter,* 55 Cal.App.2d 13 [130 P.2d 186].)

■ A conveyance to his daughter by a debtor who furnishes the consideration for the conveyance and directs it to be made to her by the seller, with the intent to delay or defraud his own creditors, will be set aside and the property will be applied in satisfaction of the creditors' claims. (*Lander* v. *Beers,* 48 Cal. 546; *Clifton* v. *Herrick,* 16 Cal.App. 484 [117 P. 622].)

■ The relationship of parent and child, when coupled with other suspicious circumstances, may be sufficient to raise an inference of fraud in the conveyance. (12 Cal.Jur. 974, § 15.) " 'Any relation which gives rise to confidence, . . . strengthens the presumption that may arise from other circumstances, and serves to elucidate, explain or give color to the transaction. . . . Wherever this confidential relation is shown to exist, the parties are held to a fuller and stricter proof of the consideration, and of the fairness of the transaction.' " (*Cioli* v. *Kenourgios,* 59 Cal.App. 690, 696-697 [211 P. 838]; *Walker* v. *Laugharn,* 44 Cal.App.2d 469, 474 [112 P.2d 695].)

■ To make out the case alleged it was necessary that plaintiff establish that there had been a transfer of the property. (*Scholle* v. *Finnell,* 173 Cal. 372, 376-377 [159 P.

1179].) The real intent of the parties and the facts of a fraudulent transaction are peculiarly within the knowledge of those sought to be charged with fraud. Direct proof of a transfer and of a fraudulent intent is often an impossibility. [5] Hence proof indicative of a transfer and of fraud may come by inference from circumstances surrounding the transaction, the relationship and interest of the parties. (*Taylor* v. *Osborne-Fitzpatrick Fin. Co.*, 57 Cal.App.2d 656, 661 [135 P.2d 598] ; *Burns* v. *Radoicich*, 77 Cal.App.2d 697, 702 [176 P.2d 77].)

Goldy testified that he and his wife did not want defendant to purchase an automobile until they returned from their trip because they would worry about her. They intended to disembark in San Francisco. However, the day their ship docked at San Diego—the first entry the ship made into the United States—they went to a Cadillac dealer in San Diego about an automobile. They telephoned to defendant. She went to San Diego immediately by bus and, so she says, with $2,658 in her pocketbook. Goldy and his wife with defendant forthwith went back to the same Cadillac dealer. Defendant gave the Cadillac salesman $200 in cash, saying she did not have the balance when, if she received the money from her grandmother, she did. The next day she gave him $2,221 in currency, mostly in $100 bills, taking the money from her purse. Defendant asked that the car be registered in the name of Edith Allen, and not in that of Edith Allen Goldy. A 17-year-old employed child buys a Cadillac, pays for it with cash, and has it registered in a fictitious name.

The money used to pay for the car was not traced to any bank account. Defendant claims that her grandmother had kept the money for her and that she never was concerned as to the exact amount of money she had given her grandmother or how much her grandmother held for her. Neither one kept any records. The grandmother's testimony was conflicting as to where she kept defendant's money, whether in a bank account or in a trunk at home. She mingled it with her own money.

The car was driven to Los Angeles, which was Goldy's home. Goldy drove the car to Burbank. Goldy and his wife then left defendant in Los Angeles and drove the car to San Francisco purportedly to see Bernstein, where it was attached. In talking to Cowpland, Goldy referred to the car as "my new car."

When the automobile was purchased on June 8, defendant knew her father's financial plight and that his liabilities were greater than his assets. Goldy was insolvent and was seeking to circumvent his creditors. It may be reasonably inferred that the money used to pay for the car, if in fact Goldy did not and the grandmother did give it to defendant, was Goldy's.

We think it patent the reasonable inferences which may be drawn from the evidence amply warranted the trial court in concluding that Goldy, while insolvent, purchased the car with his own funds, and without consideration and with intent to defraud his creditors placed the car in the name of his daughter, using a fictitious name for that purpose. (*Badal* v. *Adams,* 16 Cal.2d 127 [104 P.2d 1023].)

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.