T.C. Memo. 1998-279


UNITED STATES TAX COURT


WILLIAM NORWALK, TRANSFEREE, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 20685-96, 20686-96,     Filed July 30, 1998.
            20767-96, 20772-96,
            20773-96.


<u>Harry J. Kaplan</u> and <u>John F. Hopkins</u>, for petitioners.

<u>LaVonne D. Lawson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  These consolidated cases involve transferee liability, deficiencies, penalties, and an addition to tax determined by respondent as follows:

------

[1]The following cases are consolidated:  Robert DeMarta, Transferee, docket No. 20686-96; DeMarta & Norwalk, CPA's, Inc., docket No. 20767-96; William R. Norwalk, docket No. 20772-96; and Robert and Patricia DeMarta, docket No. 20773-96.

William Norwalk, Transferee
docket No. 20685-96

| Year | Transferee Liability |
|------|---------------------|
| 1992 | $165,940 |

Robert DeMarta, Transferee
docket No. 20686-96

| Year | Transferee Liability |
|------|---------------------|
| 1992 | $505,935 |

DeMarta & Norwalk, CPA's, Inc.
docket No. 20767-96

| Year | Deficiency | Accuracy-related Penalty Sec. 6662 |
|------|-----------|-----------------------------------|
| 1992 | $232,540 | $46,508 |

William R. Norwalk
docket No. 20772-96

| Year | Deficiency | Accuracy-related Penalty Sec. 6662 |
|------|-----------|-----------------------------------|
| 1992 | $44,088 | $8,818 |

Robert and Patricia DeMarta
docket No. 20773-96

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-related Penalty Sec. 6662 |
|------|-----------|--------------------------------|-----------------------------------|
| 1992 | $150,249 | $7,512 | $30,050 |

After concessions by the parties, the issues for decision are: (1) Whether DeMarta & Norwalk, CPA's, Inc. (the corporation), realized a gain of $588,297 on the distribution of

its intangible assets to its shareholders in a liquidation; (2) whether the corporation is liable for depreciation recapture in the amount of $15,643 on the distribution of its tangible assets to its shareholders in a liquidating distribution in 1992; (3) whether Robert and Patricia DeMarta realized a capital gain of $505,935 on the receipt of property from the corporation in a liquidating distribution in 1992; (4) whether William R. Norwalk realized a capital gain of $165,940 on the receipt of property from the corporation in a liquidating distribution in 1992; (5) whether the corporation is entitled to a deduction, reported as consulting fees, of $40,000 for payments to the shareholders in 1992; (6) whether Robert DeMarta and William R. Norwalk are required to report such payments, in the amounts of $23,320 and $16,680, respectively, as dividend income; (7) whether Robert and Patricia DeMarta are liable for an addition to tax under section 6651(a)(1)[2] and an accuracy-related penalty under section 6662; (8) whether the corporation is liable for an accuracy-related penalty under section 6662; (9) whether William Norwalk is liable for an accuracy-related penalty under section 6662; and (10) whether Messrs. DeMarta and Norwalk are liable as transferees for the corporation's 1992 Federal income tax liability.

FINDINGS OF FACT

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Some of the facts are stipulated and are incorporated herein by this reference.

At the time of the filing of the petitions in these consolidated cases, each of the individual petitioners resided in Fremont, California, and the corporate petitioner, DeMarta & Norwalk, CPA's, Inc., maintained its principal office in Fremont, California. Robert DeMarta and William Norwalk (sometimes referred to as the shareholders) are certified public accountants (C.P.A.'s) and provide accounting services on a full-time basis. Mr. DeMarta became a C.P.A. in approximately 1970, while Mr. Norwalk became a C.P.A. in 1980.

In 1985, Messrs. DeMarta and Norwalk organized DeMarta & Norwalk, CPA's, Inc., which was incorporated in California on August 14, 1985. The business of the corporation was the practice of public accounting. At all times during the corporation's existence, Messrs. DeMarta and Norwalk have been its only shareholders.

On September 3, 1985, Messrs. DeMarta and Norwalk signed separate agreements with the corporation regarding their respective ownership interests in, and rights and duties regarding, the corporation. Each agreement is entitled "Employment Agreement". The effective date set forth on these agreements was October 1, 1985, and each provides, among other things, the following:

## TERM

5.  The term of employment shall be five years from the date specified in Schedule A attached to this Agreement, subject to the following conditions:

(a)  This Agreement may be terminated at any time by mutual agreement in writing of the Corporation and Employee.

(b)  Employee shall have the absolute right to unilaterally terminate this Agreement by providing the Board of Directors with written notice of termination and, in that case, termination shall occur upon the expiration of ninety (90) days after the date of the notice.

*     *     *     *     *     *     *

(h)  Either party may terminate this Agreement after the expiration of 15 months by giving the other 30 days written notice.

## RESTRICTIVE COVENANT

6.  Employee agrees that during the term of this Agreement he will not engage in any other business duties or pursuits whatsoever, directly or indirectly, except activities approved in writing by the Board of Directors, directorships in companies not in competition with the Corporation, and passive personal investments.  Furthermore, Employee will not, directly or indirectly, acquire, hold, or retain any interest in any business competing with or similar in nature to the business of the Corporation, and will not own or hold to any substantial degree any securities in any company competing with the Corporation.

*     *     *     *     *     *     *

## DISCLOSURE OF INFORMATION

8.  Employee recognizes and acknowledges that the list of the Corporation's clients, as it may exist from time to time, is a unique asset of the Corporation's business.  Employee will not, during or after the term

of employment, disclose the list of the Corporation's clients or any part of it to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever.  In the event of a breach or threatened breach by Employee of the provisions of this Paragraph, the Corporation shall be entitled to an injunction restraining Employee from disclosing, in whole or in part, the list of the Corporation's clients, or from rendering any services to any person, firm, corporation, association, or other entity to whom the list, in whole or in part, has been disclosed or is threatened to be disclosed.  Nothing in this Agreement shall be construed as prohibiting the Corporation from pursuing any other remedies available to the Corporation for disclosure, including the recovery of damages from Employee.

\*     \*     \*     \*     \*     \*     \*

## RECORDS

11.  On the termination of this Agreement, Employee shall not be entitled to keep or preserve records or charts of the Corporation as to any client unless a client specifically requests a different disposition of those records, and in no event shall Employee be entitled to the records of clients not served by him.

Subsequent to the term of the shareholders' respective agreements with the corporation, no other agreements between the shareholders and the corporation were entered into.  Accordingly, Messrs. DeMarta and Norwalk were not bound by any covenant not to compete on June 30, 1992.

As of June 30, 1992, in addition to the shareholders, the corporation had eight employees, four of whom were accountants. No other employee of the corporation signed any employment agreement with the corporation.

On June 30, 1992, the corporation's assets were distributed to its shareholders.  On that date, Mr. DeMarta held 75 percent of the corporation's stock, while Mr. Norwalk held the remaining 25 percent.  Only a nominal amount of assets was left in the corporation after this distribution.  This distribution constituted a complete liquidation of the corporation in 1992. The corporation did not continue to provide accounting services after June 30, 1992, and the business of the corporation did not continue.  The corporation has never been dissolved.

The corporation reported the following revenues and expenditures on its Federal income tax returns for the years 1988 through 1992:

| Item from returns | 1988 | 1989 | 1990 | 1991 | 1992 |
|---|---|---|---|---|---|
| Gross receipts | $666,185 | $850,527 | $938,096 | $967,495 | $730,989 |
| Form 4797 gain/loss | -- | (5,481) | -- | -- | -- |
| Other income | -- | -- | 480 | -- | 194 |
| Deductions | | | | | |
| Comp. of officers | 168,024 | 187,383 | 177,363 | 197,341 | 74,654 |
| Salaries & wages | 249,091 | 343,935 | 377,676 | 381,135 | 218,813 |
| Repairs | 2,404 | 4,528 | -- | 6,664 | -- |
| Bad debts | 602 | -- | -- | -- | -- |
| Rents | 62,039 | 54,471 | 82,219 | 101,628 | 56,379 |
| Taxes | 29,245 | 36,732 | 41,200 | 44,283 | 26,048 |
| Interest | 14,563 | 16,421 | 30,993 | 23,622 | 11,162 |
| Charitable contr. | -- | -- | -- | -- | 99 |
| Depreciation | 11,516 | 19,019 | 32,371 | 27,190 | 8,045 |
| Amortization | 334 | 334 | 252 | -- | -- |
| Pension plan | -- | 41,337 | 44,264 | 51,589 | -- |
| Bank charges | -- | -- | -- | 68 | -- |
| Meals & enter. | 1,930 | 6,577 | 18,266 | 1,761 | 10,323 |
| Books & journals | 6,527 | 3,708 | 2,757 | 1,791 | 2,774 |
| Client costs | 38 | 118 | 3,997 | 12,331 | 80 |
| Computax costs | 41,897 | 49,762 | 15,228 | -- | -- |
| Computer costs | 3,543 | 15,571 | 14,161 | 11,314 | -- |
| Continuing educ. | 10,273 | 17,447 | 12,524 | 7,807 | 9,408 |
| Dues & subscript. | 4,376 | 19,005 | 18,136 | 8,903 | 10,564 |
| Insurance | 26,474 | 42,401 | 49,475 | 45,219 | 29,466 |
| Meetings | 3,089 | -- | -- | 6,825 | -- |
| Per diem fees | -- | -- | -- | 15,677 | -- |

| | | | | | |
|---|---|---|---|---|---|
| Library service | -- | -- | -- | 1,000 | -- |
| Office expense | 13,333 | 24,640 | 25,567 | 26,073 | 14,197 |
| Employment agency | 5,486 | -- | -- | -- | -- |
| Payroll processing | 767 | 1,067 | 659 | -- | -- |
| Postage | 4,546 | 6,940 | 6,944 | 7,441 | 7,684 |
| Telephone | 8,289 | 7,803 | 9,911 | 8,013 | 5,182 |
| Travel | 2,838 | 6,825 | 7,022 | 1,971 | 6,445 |
| Tax processing costs | -- | -- | -- | 1,577 | 3,590 |
| Advertising | 1,718 | 2,551 | 1,755 | 4,449 | 4,094 |
| Consulting fees | -- | 3,225 | -- | -- | 40,000 |
| Peer review expense | -- | 4,952 | -- | -- | -- |
| Pension administration | -- | 700 | 372 | 270 | 465 |
| Legal & professional | 450 | -- | 8,986 | -- | -- |
| Supplies | -- | -- | 10,001 | -- | 8,492 |
| Equipment rental | 631 | 219 | 7,459 | 1,808 | 5,611 |
| Moving expenses | -- | 500 | 4,522 | -- | -- |
| | | | | | |
| Total expenses | 674,023 | 918,171 | 1,004,080 | 997,750 | 553,575 |
| | | | | | |
| Taxable income/loss | (7,838) | (73,125) | (65,504) | (30,255) | 177,608 |

From 1988 to 1992, the shareholders received the following salaries from the corporation:

| Year | Mr. DeMarta | Mr. Norwalk |
|---|---|---|
| 1988 | $98,024 | $70,000 |
| 1989 | 107,463 | 79,920 |
| 1990 | 107,440 | 69,923 |
| 1991 | 107,440 | 89,901 |
| 1992 | 40,880 | 33,774 |

A portion of the salaries paid to Messrs. DeMarta and Norwalk was derived from bank loans guaranteed by the shareholders and from loans made to the corporation by the shareholders. At the beginning of the corporation's 1992 tax year, it had outstanding loans from shareholders of $22,533. At the end of the corporation's 1992 tax year, its liabilities included outstanding loans from the shareholders of $96,678.

In addition to their salaries from the corporation, Messrs. DeMarta and Norwalk received $23,320 and $16,680, respectively,

in 1992. A total of $40,000 representing these additional amounts was deducted by the corporation as consulting fees on its 1992 Federal income tax return. Mr. Norwalk reported this additional amount as ordinary income on his 1992 Federal income tax return. Mr. DeMarta did not report any of this additional amount on his Federal income tax return.

On January 3, 1992, as reflected in the corporation's minutes, the board of directors (Messrs. DeMarta and Norwalk) authorized the distribution of the corporation's assets and liabilities to the shareholders. These corporate minutes provided the following reason for this distribution:

> Due to lack of profitability, it was decided to stop practice as Certified Public Accountants within the structure of DeMarta & Norwalk. It was further decided to distribute all available assets and liabilities to the shareholders. Each shareholder would then be able to pursue a professional practice on their own or as partners with other CPA(s).

On July 1, 1992, following the distribution of the corporation's assets, Messrs. DeMarta and Norwalk became partners of the accounting firm Ireland, San Filippo (the partnership), and transferred assets, distributed to them by the corporation, to the partnership. The partnership did not use the corporation's name. The tangible assets distributed to the shareholders included all the corporation's furniture and equipment, which the corporation reported on its 1992 Federal income tax return at a value of $59,455. These assets were

contributed to the partnership at an agreed value of $59,455. The shareholders also transferred their share of the corporation's receivables to the partnership. These assets were contributed to the partnership (less liabilities assumed by the partnership) in exchange for the opening balances of the respective partnership capital accounts of Messrs. DeMarta and Norwalk. The partnership did not assume tax obligations of the corporation, nor did it assume the debts owed by the corporation to the shareholders. The opening capital account balances in the partnership for Messrs. DeMarta and Norwalk were $39,202 and $28,041, respectively.

Messrs. DeMarta and Norwalk each executed a partnership agreement when they joined the partnership. Under the terms of the partnership agreement, Messrs. DeMarta and Norwalk were treated as equal partners and subject to the same formula for allocation of compensation. This partnership agreement also contained certain provisions restricting the partners' ability to compete with the partnership.

The partnership assumed the corporation's lease and occupied its former offices from July 1, 1992, to April 25, 1994. On April 28, 1994, after vacating these offices, the partnership subleased the space. At the time of the sublease, the remaining term of the lease was 8 months. The partnership subsidized one-third of the rent when it subleased the space.

As of June 30, 1992, other than the shareholders, the corporation employed the following persons: Barbara Bailey; Karin Laster; Beverly Hagan, C.P.A.; Thomas Tang, C.P.A.; Don Christman, C.P.A.; Jeanette Joyce, accountant; Judy Cunningham, administrator; and Joan Long, secretary. After the liquidation of the corporation, many of its former employees were subsequently employed by the partnership. By the end of October 1992, both Beverly Hagan and Thomas Tang left the partnership to set up their own separate accounting practices. When Mr. Tang left, Barbara Bailey, a computer consultant, and Karin Laster, a bookkeeper, also left the partnership to work for Mr. Tang.

When Ms. Hagan and Mr. Tang left to set up their individual practices, they each sent announcements to former clients of the corporation and to clients of the partnership informing them of their move. The partnership received at least 92 requests from former clients to have the information contained in their files made available to either Ms. Hagan or Mr. Tang. Pursuant to these client authorizations, the partnership permitted Ms. Hagan and Mr. Tang to copy the files of clients that left the partnership. Neither Messrs. DeMarta and Norwalk nor the partnership requested any compensation for any clients lost to either Ms. Hagan or Mr. Tang. Five years following the liquidation of the corporation, only about 10 percent of the

accounts serviced by the corporation remained with the partnership.

## OPINION

The principal issue underlying all these consolidated cases is the fair market value of the corporation's assets on the date of distribution.

Customer-Based Intangibles

Respondent contends that when the corporation was liquidated, it distributed to its shareholders "customer-based intangibles" in addition to tangible assets. Respondent describes the intangible assets at issue to include the corporation's client base, client records and workpapers, and goodwill (including going-concern-value). Respondent's position is that these intangibles were assets of the corporation that had a specific value and that when distributed to the shareholders in the liquidation, triggered taxable gain to the corporation. Liability in respect of a deficiency in the corporation's tax and penalty was then asserted by respondent against the shareholders of the corporation as transferees. Respondent also determined that the transfer of the customer-based intangibles received by the shareholders generated taxable gain to the shareholders.

Petitioners maintain that the corporation did not own the intangibles in question. Rather, petitioners argue that the

accountants themselves owned the intangibles, and, thus, there was no transfer nor any corresponding taxable gain attributable to these intangibles.

Generally, gain or loss must be recognized by a liquidating corporation on the distribution of property in complete liquidation as if such property were sold to the distributee at its fair market value. Sec. 336(a). Petitioners do not contend that the provisions of section 336(a) should not apply here. The corporation must recognize gain calculated as the difference between the fair market value of the distributed property and the corporation's basis in that property.

Moreover, amounts received by the shareholders in a distribution in complete liquidation of the corporation must be treated as in full payment in exchange for the corporation's stock. Sec. 331(a). The shareholders must recognize any gain on the receipt of the property in the liquidating distribution. The gain to the shareholder is computed by subtracting the shareholder's adjusted basis in the stock from the amount realized. Sec. 1001(a); sec. 1.331-1(b), Income Tax Regs. The amount realized is the sum of any money received on the distribution plus the fair market value of the property received (other than money).[3] Sec. 1001(b). This gain is reduced by the

---

[3]Sec. 1.331-1(e), Income Tax Regs., provides that a shareholder's gain or loss on a liquidating distribution be
(continued...)

outstanding corporate liabilities assumed by the shareholders, if any.  Here, the loans payable to the shareholders totaled $96,678 as of June 30, 1992.[4]

We have recognized that goodwill is a vendible asset which can be sold with a professional practice.  LaRue v. Commissioner, 37 T.C. 39, 44 (1961); Watson v. Commissioner, 35 T.C. 203, 209 (1960).  Goodwill is often defined as the expectation of continued patronage.  Newark Morning Ledger Co. v. United States, 507 U.S. 546 (1993).  In Rudd v. Commissioner, 79 T.C. 225, 238 (1982), we stated:

> The goodwill of a public accounting firm can generally be described as the intangibles that attract new clients and induce existing clients to continue using the firm.  These intangibles may include an established firm name, a general or specific location of the firm, client files and workpapers (including correspondence, audit information, financial statements, tax returns, etc.), a reputation for general or specialized services, an ongoing working relationship between the firm's personnel and clients, or accounting, auditing, and tax systems used by the firm.  * * *

---

[3](...continued) calculated on a per-share basis.  The parties have stipulated the shareholders' bases in the corporation's stock, which are used for purposes of calculating the shareholder gain on the distribution.

[4]It is not clear from the record whether respondent allowed any reduction for liabilities assumed by the shareholders in making his determination.

In determining the value of goodwill, there is no specific rule, and each case must be considered and decided in light of its own particular facts. MacDonald v. Commissioner, 3 T.C. 720, 726 (1944). Moreover, in determining such value it is well established that the earning power of the business is an important factor. Estate of Krafft v. Commissioner, T.C. Memo. 1961-305. In Staab v. Commissioner, 20 T.C. 834, 840 (1953), we stated:

> Goodwill, then, is an intangible consisting of the excess earning power of a business. A normal earning power is expected of the business assets, and if the business has greater earnings, then the business may be said to have goodwill. This excess in earning power may be due to any one or more of several reasons, and usually this extra value exists only because the business is a going concern, being successful and profitable. Goodwill may arise from: (1) the mere assembly of the various elements of a business, workers, customers, etc., (2) good reputation, customers' buying habits, (3) list of customers and their needs, (4) brand name, (5) secret processes, and (6) other intangibles affecting earnings.

Both parties presented testimony from expert witnesses regarding the value of the corporation's intangible assets. In appraising the value of the corporation's intangibles, petitioners' expert stated: "Intangible value within a company (or goodwill value) is based upon the existence of excess earnings." After examining financial information from the corporation's Federal income tax returns, the pay history of Messrs. DeMarta and Norwalk, and Federal Government guidelines

for an accountant's pay, he found that the corporation did not
have excess earnings or earnings over and above a return on
tangible assets.  Consequently, petitioners' expert concluded
that the corporation was worth the value of its tangible assets[5]
and that there was no intangible or goodwill value at the time of
the distribution to the shareholders.  He then addressed the
valuation of the corporation's client list.  Recognizing that in
a service-related business the client relationship is normally
between the client and the professional who services that client,
petitioners' expert concluded that "Without an effective non-
competition agreement, the clients have no meaningful value."
Recognizing that there was no restriction on the ability of the
individual accountants to compete with the corporation, he
concluded that the client-related goodwill and intangibles
belonged to the professional accountants (individually) who
serviced the clients and that a list of these clients had no
material value.

We have held that there is no salable goodwill where, as
here, the business of a corporation is dependent upon its key
employees, unless they enter into a covenant not to compete with
the corporation or other agreement whereby their personal
relationships with clients become property of the corporation.

---

[5]Petitioners' expert expressed no opinion with respect to
the value of the tangible assets of the corporation.

Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 207 (1998)

("personal relationships of a shareholder-employee are not

corporate assets when the employee has no employment contract

with the corporation"); Estate of Taracido v. Commissioner, 72

T.C. 1014, 1023-1024 (1979); Cullen v. Commissioner, 14 T.C. 368,

372 (1950); MacDonald v. Commissioner, supra at 727; cf.

Schilbach v. Commissioner, T.C. Memo. 1991-556.[6]

   We have no doubt that most, if not all, of the clients of

the corporation would have "followed" the accountant who serviced

that client if the accountant would have left the corporation.

For instance, when Mr. Tang and Ms. Hagan left the partnership

shortly after the corporation was liquidated, at least 92 clients

engaged these former employees to provide future services.  On

the record here, it is reasonable to assume that the personal

ability, personality, and reputation of the individual

accountants are what the clients sought.  These characteristics

did not belong to the corporation as intangible assets, since the

---

[6]In support of his position, respondent cites Schilbach v. Commissioner, T.C. Memo. 1991-556.  In Schilbach, we found that a medical practice, operating as a corporation, had goodwill despite the lack of a covenant not to compete.  Schilbach is distinguishable from the instant case in that in Schilbach some of the goodwill of the medical practice was inherent in the operating entity and was not solely dependent upon the employee-shareholder's ability.  Moreover, in Schilbach, we found it doubtful that the employee-shareholder would have competed with the medical practice due to his inability to obtain malpractice insurance and his physical and mental condition.  We do not find that the same circumstances exist in the instant cases.

accountants had no contractual obligation to continue their connection with it.  There is no persuasive evidence that the name and location of the corporation had any value other than for their connection with the accountants themselves.

The situation in the instant case is similar to that in MacDonald v. Commissioner, supra.  In MacDonald, the taxpayer and his wife were the sole shareholders in an incorporated insurance agency.  They subsequently liquidated the corporation, distributing all assets to the husband, who proceeded to set up an insurance agency under a name similar to the name of the liquidated corporation and solicited the clients of the corporation.

The issue presented to us in that case was whether there was any valuable goodwill passing from the corporation to the taxpayers upon liquidation of the corporation.  The corporation had no exclusive right to the business of any policyholder, and without a covenant not to compete from the taxpayer, the business of the corporation had no market value.  In holding that there was no goodwill passing to the taxpayers because the goodwill was solely attributable to the personal abilities of the taxpayers, we stated:

> The facts in the instant cases established that any value which this business may have had on July 31, 1941, in addition to its tangible assets, was due to the personal ability, business acquaintanceship, and other individualistic qualities of D. K. MacDonald.  As

one witness put it, "Mr. MacDonald was the Company."
The policy of the corporation was decided by D. K.
MacDonald and all employees worked under his direction
and supervision.  There existed no contract between the
corporation and any of its employees, including D. K.
MacDonald, with respect to future services.  Neither
the name of the corporation, its location, its agency
agreements, nor its existing policies with customers
had any value.  If the law prevents the recognition of
the personal ability and personality of D. K. MacDonald
as an element of this corporation's goodwill for income
tax purposes, then petitioners did not receive any
goodwill as a result of their acquisition of this
corporation's assets.

    We find no authority which holds that an
individual's personal ability is part of the assets of
a corporation by which he is employed where, as in the
instant cases, the corporation does not have a right by
contract or otherwise to the future services of that
individual.  * * *  [MacDonald v. Commissioner, 3 T.C.
at 727.]

We further held in MacDonald that there was no marketable

asset embodying the goodwill of the corporation which could be

sold to a third party.  We recognized the possibility that a

purchaser might take over the customer list of the corporation on

a contingency basis.  In holding that this type of an arrangement

has no fair market value, we stated:

    It is true that goodwill may be the subject of
    exchange.  Here, however, Cassatt and Company [the
    seller] did not undertake to transfer its goodwill to
    Pierce [the purchaser] in exchange for property of an
    ascertainable market value.  On the contrary the
    transfer was made in consideration of Pierce's promise
    to share with Cassatt and Company for six years in the
    future any commissions which it might earn during that
    period from business with Cassatt customers.  The
    receipt of such commissions was wholly contingent upon
    Pierce's remaining in business and obtaining business
    from the former Cassatt customers, neither of which it

was under any obligation to do. It is settled that such a promise to make payments in the future "wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty" has no ascertainable fair market value. Burnet v. Logan, 283 U.S. 404, 413, 51 S. Ct. 550, 552, 75 L.Ed. 1143. [Id. at 729 (quoting Cassatt v. Commissioner, 137 F.2d 745, 748 (3d Cir. 1943), affg. 47 B.T.A. 400 (1942)).]

Therefore, for the same reasons as given in MacDonald, we hold that at the time of the corporation's liquidation it had no goodwill, either in terms of a client list or in any other form, which could be distributed to the individual shareholders or sold to a third party.

We have carefully considered the testimony of respondent's experts who testified that in their opinion a fair value of the corporation would be $870,000, of which $266,000 would represent the value of the client list and $369,000 would represent goodwill.[7] However, we conclude that their opinion regarding the intangible assets of the corporation is of no probative force in light of other evidence of record and existing case law.

Respondent's experts based their opinion as to the value of the goodwill and the client list upon an approximation of earnings that they made based upon the volume of business actually done by the corporation but using cost percentages

---

[7]Respondent made no separate determination as to any going-concern-value that the corporation may have had. Moreover, respondent's experts fail to attribute any value to such an asset.

normal to the industry, which were far less than the corporation's actual operating costs. These approximations are not in line with the actual experience of the corporation, and the record does not establish that there was any reasonable expectation that such costs could have been so reduced. See Estate of Krafft v. Commissioner, T.C. Memo. 1961-305.

More importantly, respondent's experts valued the corporation's client list and goodwill as if a covenant not to compete was in effect on the date of distribution. Respondent's expert, Mr. Kettell, testified that such a restriction is a very important factor in valuing the intangibles of the corporation. However, we have found that there were no restrictions on the corporation's employees to compete with it on the date of distribution. Nevertheless, in determining the corporation's value, respondent's experts relied upon the restrictions expressed in the partnership agreement executed by Messrs. DeMarta and Norwalk after the distribution of the corporation's assets. The parties to the partnership agreement are Messrs. DeMarta and Norwalk and the existing partners of the partnership, not the corporation. This agreement was not enforceable by the corporation and should have no bearing on the valuation of the corporation on the date that it distributed its assets.

In view of the foregoing, we conclude that there were no transferable "customer-based intangibles" belonging to the

corporation independent of the abilities, skills, and reputation of the individual accountants. "Ability, skill, experience, acquaintanceship, or other personal characteristics or qualifications do not constitute goodwill as an item of property, nor do they exist in such form that they could be the subject of transfer." Providence Mill Supply Co. v. Commissioner, 2 B.T.A. 791, 793 (1925). In O'Rear v. Commissioner, 28 B.T.A. 698, 700 (1933), affd. 80 F.2d 473 (6th Cir. 1935), we stated that "it is at least doubtful whether a professional man can sell or dispose of any goodwill which may attach to his practice except perhaps by contracting to refrain from practicing." (Emphasis added.) Because there was no enforceable contract which restricted the practice of any of the accountants at the time of the distribution, their personal goodwill did not attach to the corporation. Any goodwill transferred to the partnership was that of the individual accountants, not the corporation. Under these circumstances, we conclude that the value of any "customer-based intangibles" that the corporation may have had was nominal. We hold that petitioners have met their burden of establishing that value is not allocable to the customer-based intangibles as determined by respondent.

Tangible Asset Value

Respondent increased the corporation's taxable income by $15,643 for section 1245 depreciation-recapture income, resulting from the distribution of its tangible assets to the shareholders.[8]  Section 1245(a)(1) provides for the recapture of depreciation as ordinary income upon the disposition of section 1245 property.  Personal property used in a trade or business is section 1245 property.  Sec. 1245(a)(3)(A).  Here, the amount recaptured is the amount by which the lower of the recomputed basis of the property or the fair market value of such property, exceeds the adjusted basis of the property.  Sec. 1245(a)(1).  Recomputed basis means the adjusted basis of the property recomputed by adding thereto all adjustments reflected in such adjusted basis on account of deductions allowed or allowable to the taxpayer for depreciation.[9]  Sec. 1245(a)(2)(A).

The corporation reported an adjusted basis in its tangible assets of $59,455 on its 1992 Federal income tax return.  Respondent's experts stated that the corporation's tangible assets, which were distributed to the shareholders and then transferred to the partnership, had a fair market value of

---

[8]Neither party argues that any of the tangible assets of the corporation is other than sec. 1245 property.

[9]Petitioners submitted a list of the tangible assets at issue, which reflects an approximate recomputed basis of $179,880.  Because both parties contend that the fair market value of the property is less than this amount, we rely on the fair market value to determine any gain recognized from depreciation recapture.

$102,000. Respondent's experts arrived at their opinion by estimating the replacement cost of items listed on an asset ledger and then subtracting an amount for accumulated depreciation based upon an estimate using each item's age and useful life. The amount of depreciation was calculated using the experts' own "in house developed software."[10] However, none of the tangible assets were inspected by respondent's experts, nor did they have any actual knowledge of the nature or condition of the assets distributed.

Petitioners, on the other hand, argue that the tangible assets of the corporation had a fair market value equal to, or less than, the corporation's adjusted basis in the assets on the date of distribution. The tangible assets at issue were contributed to the partnership at an agreed value equal to the corporation's basis as reported on its 1992 Federal income tax return. Petitioners rely upon the contribution value of the tangible assets as evidence of the assets' fair market value. It is well established that the best evidence of fair market value is the amount paid for property in an arm's-length transaction at or near the relevant valuation date. Chiu v. Commissioner, 84 T.C. 722, 734 (1985). Respondent does not argue that the contribution of the tangible assets by the shareholders was other than at arm's length, and the opinions of respondent's experts do

---

[10]Additionally, the market approach was used as a check for some items, such as computer equipment.

not convince us that the fair market value of the tangible assets at the time of the distribution was anything other than $59,455. Accordingly, the corporation did not realize recapture income on the distribution.

## Consulting Fees

The corporation paid the shareholders $40,000 in addition to their salaries for 1992, which the corporation deducted as consulting fees. Respondent determined that the corporation was not entitled to the subject deduction and that the shareholders must report the amounts they received with respect to this deduction as dividend income. No documentary evidence has been presented to establish that the $40,000 deducted by the corporation was paid to the shareholders for services provided to the corporation in the year deducted. The corporation has failed to meet its burden of establishing that it is entitled to deduct the $40,000 payment to the shareholders in 1992 as consulting fees or that it should not characterize the amounts as dividends as respondent contends.

Petitioners Robert and Patricia DeMarta conceded respondent's determination in regard to this issue. Petitioner William Norwalk reported the $16,680 as business income and deducted $1,425 as business expenses. Respondent adjusted this by determining that the $16,680 was unreported dividend income and simultaneously reducing reported business income by $15,255

(the difference between the $16,680 business income and $1,425 expense) that Mr. Norwalk reported.  This results in a net increase in taxable income of $1,425, which we uphold.

Failure To File--Section 6651(a)

Respondent determined that Robert and Patricia DeMarta are liable for an addition to tax under the provisions of section 6651(a).  Section 6651(a) imposes an addition to tax for failure to timely file a return, unless the taxpayer establishes that such failure is due to reasonable cause and not due to willful neglect.  Mr. and Mrs. DeMarta failed to file their 1992 individual tax return within the period allowed for filing.  An extension to file their return was granted until October 15, 1993.  According to the notice of deficiency issued to Mr. and Mrs. DeMarta, their 1992 return was filed on October 27, 1993. Petitioners have provided no evidence or argument on this issue. We find that Mr. and Mrs. DeMarta are liable for the addition to tax in accordance with section 6651(a)(1).

Imposition of Accuracy-Related Penalty--Section 6662(a)

Respondent has determined that the corporation, William R. Norwalk, and Robert and Patricia DeMarta are liable for accuracy-related penalties under section 6662(a).  Section 6662(a) provides that, if it is applicable to any portion of an underpayment in taxes, there shall be added to the tax an amount

equal to 20 percent of the portion of the underpayment to which section 6662 applies.  Section 6662(b)(1) provides that section 6662 shall apply to the portion of any underpayment attributable to negligence or disregard of rules or regulations.  Section 6662© provides that the term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term "disregard" includes any careless, reckless, or intentional disregard of rules or regulations.  Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).

However, under section 6664(c), no penalty shall be imposed under section 6662(a) with respect to any portion of any underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.  The Commissioner's determination is presumptively correct and will be upheld unless the taxpayer is able to rebut the presumption.  Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); Bixby v. Commissioner, 58 T.C. 757, 791 (1972); Reily v. Commissioner, 53 T.C. 8, 13-14 (1969).

In the notices of deficiency issued to the corporation, William R. Norwalk, and Robert and Patricia DeMarta, respondent applied the section 6662(a) penalty to "all or part of the underpayment of tax".  With regard to the $23,320 adjustment conceded by petitioners Robert and Patricia DeMarta, they have

presented no evidence to show that they acted with reasonable cause or good faith.[11]  Therefore, we find that the accuracy-related penalty under section 6662(a) applies to the underpayment of tax associated with this settled issue.

In regard to the $40,000 deducted by the corporation as consulting fees, we have upheld respondent's determination. After thoroughly reviewing the record in these cases, we find no persuasive evidence or argument that the corporation acted with reasonable cause or good faith with respect to this issue.  On this record, we hold that the corporation negligently or intentionally disregarded rules or regulations with regard to the underpayment of tax associated with this issue.  Accordingly, the accuracy-related penalty under section 6662(a) is sustained with respect to the underpayment of tax associated with this deduction by the corporation.

Mr. Norwalk reported his allocable portion of the dividend ($16,680) on his return.  Even though he did not characterize this amount as a dividend, the net effect of this was de minimis. We find that any understatement attributable to this was not due to negligence.  Thus, Mr. Norwalk is not liable for the accuracy-related penalty under section 6662(a).

Transferee Liability

---

[11]With respect to the adjustments in the notice of deficiency issued to Robert and Patricia DeMarta, the parties filed a stipulation of settled issues with this Court on Oct. 24, 1997.

Section 6901(a)(1)(A) authorizes the assessment of transferee liability in the same manner as the taxes in respect of which the liability was incurred.  This provision does not create a new liability; it merely provides a remedy for enforcing the existing liability of the transferor.  Coca-Cola Bottling Co. v. Commissioner, 334 F.2d 875, 877 (9th Cir. 1964), affg. 37 T.C. 1006 (1962); Mysse v. Commissioner, 57 T.C. 680, 700-701 (1972). The Commissioner has the burden of proving all the elements necessary to establish the taxpayer's liability as a transferee except for proving that the transferor was liable for the tax. Sec. 6902(a); Rule 142(d).

The substantive questions of whether a transferee is liable for the transferor's obligation and the extent of his liability depend on State law.  See Commissioner v. Stern, 357 U.S. 39, 45 (1958); Adams v. Commissioner, 70 T.C. 373, 389 (1978), affd. without published opinion 688 F.2d 815 (2d Cir. 1982).  All the transfers in the instant case occurred in California; hence, California law governs.  Adams v. Commissioner, supra at 390.

Respondent contends that Messrs. DeMarta and Norwalk are liable as transferees under Cal. Corp. Code section 2009 (West 1990).  That section provides creditors with a cause of action against shareholders who have received assets improperly distributed upon dissolution of a corporation.  Id. Cal. Corp. Code section 2004 (West 1990) provides the proper method of distributing corporate assets in a dissolution:

After determining that all the known debts and liabilities of a corporation in the process of winding up have been paid or adequately provided for, the board shall distribute all the remaining corporate assets among the shareholders according to their respective rights and preferences or, if there are no shareholders, to the persons entitled thereto.  * * *

Therefore, in order to impose transferee liability on the shareholders under this California law, respondent must prove that the shareholders improperly distributed the assets of the corporation.

At the time the corporation was liquidated, its liabilities included outstanding loans from the shareholders of $96,678.[12] On the basis of our findings in this case, we hold that respondent has not shown that the assets the shareholders received exceeded this amount.[13]  The corporate minutes signed by Messrs. DeMarta and Norwalk and dated May 1, 1992, state:

It was resolved that the Corporation, DeMarta & Norwalk, would distribute most of its assets and liabilities to the shareholders.

Each shareholder would be distributed his share of assets and liabilities (except for shareholders loans). The net asset received by each shareholder would be credited as payment toward his shareholder loan.

---

[12]Loans from shareholders increased by more than $74,000 from Jan. 1 to June 30, 1992.

[13]If we had upheld respondent's principal determination regarding the value of the "customer-based intangibles", there would be no question that the assets exceeded the corporate debt owed to the shareholders.

> There does not appear to be sufficient net assets to pay back the full amount of the shareholder loans and therefore there will be no assets available for distribution against stock, retained earnings or dividends.
>
> This distribution is to take place prior to June 30, 1992.

There is nothing in the record that would indicate that the receipt of the corporate assets was anything other than partial payment of this debt. Based upon the meager record presented on this issue, we do not find that the assets were improperly distributed under Cal. Corp. Code section 2004; thus, this law is not a valid basis for transferee liability in this case.

Respondent also contends that the shareholders are liable as transferees under Cal. Civ. Code section 3439.04 (West 1997), which provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (2) Intended to incur, or believed or reasonably should have believed that he or she would

incur, debts beyond his or her ability to pay as they became due.

Therefore, in order to establish that Messrs. DeMarta and Norwalk are liable as transferees for the amounts they received from the corporation, respondent must prove: (1) The corporation transferred the assets with "actual intent to hinder, delay, or defraud" the Internal Revenue Service; or (2) the corporation made the transfer without receiving a reasonably equivalent value in exchange for the transfer.

Actual intent may be established from circumstances surrounding the transfer of the assets. Menick v. Goldy, 280 P.2d 844 (Cal. Ct. App. 1955); Burns v. Radoicich, 176 P.2d 77 (Cal. Ct. App. 1947). As respondent recognizes, transferee liability generally results:

> when stockholders receive corporate distributions for which they do not pay an adequate and full consideration at a time when the corporation is insolvent, or thereby becomes insolvent, or is in process of liquidation. [Lesser v. Commissioner, 47 T.C. 564, 585 (1967).]

After carefully reviewing the record, we find that respondent has not met his burden of proving either actual intent to defraud or that the shareholders received assets for which they did not pay adequate and full consideration. Accordingly, we hold that Messrs. DeMarta and Norwalk are not liable as transferees.

Decisions will be entered

<u>under Rule 155</u>.